# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: | § § | CASE NO: 24-10702 |
| FCA CONSTRUCTION LLC, | § § | CHAPTER 11 |
| DEBTOR. | § § | SECTION A |

| | | |
|---|---|---|
| FCA CONSTRUCTION LLC, | § § § | |
| PLAINTIFF, | § § | |
| V. | § § | ADV. NO. 24-1007 |
| SOUTHSTAR FINANCIAL, LLC, | § § § | |
| DEFENDANT. | § § § | |

## MEMORANDUM OPINION AND ORDER DENYING MOTION TO DISMISS

Before the Court is the *Defendant's Motion To Dismiss and Incorporated Memorandum of Law* (the "Motion To Dismiss"), [ECF Doc. 29], filed by Southstar Financial, LLC ("Southstar"); the opposition to the Motion To Dismiss, [ECF Doc. 43], filed by FCA Construction LLC ("FCA"); and the reply brief in support of the Motion To Dismiss, [ECF Doc. 47], filed by Southstar.

For the following reasons, the Court **DENIES** the Motion To Dismiss.

## PROCEDURAL HISTORY

On April 11, 2024, FCA filed its petition for bankruptcy relief under chapter 11 of the Bankruptcy Code (the "Petition Date"). [No. 24-10702, ECF Doc. 1]. Along with several other "first-day motions," FCA filed an *Emergency Motion For Turnover of Property of the Estate* (the "Turnover Motion"), [No. 24-10702, ECF Doc. 9]. The Turnover Motion sought (i) a declaratory

judgment that $226,717.39 held by Southstar in escrow is property of FCA's bankruptcy estate (Count 1) and (ii) turnover of those escrowed funds to FCA as a debtor-in-possession pursuant to 11 U.S.C. § 542 (Count 2) (together, the "Turnover Claims").

On April 23, 2024, FCA filed the above-captioned adversary proceeding against Southstar seeking the same relief as in the Turnover Motion (the "Adversary Proceeding").[1] [ECF Doc. 1]. After a hearing on an emergency motion for a preliminary injunction, this Court consolidated the Turnover Motion within the Adversary Proceeding. [ECF Doc. 16]. On May 28, 2024, FCA filed an *Amended Complaint*, asserting four additional causes of action against Southstar: (i) avoidance of fraudulent transfers under 11 U.S.C. § 548 (Count 3); (ii) avoidance of preference payments under 11 U.S.C. § 547 (Count 4); (iii) recovery of avoided transfers under 11 U.S.C. § 550 (Count 5); and (iv) disallowance of all Southstar's claims under 11 U.S.C. § 502 (Count 6) (collectively, the "Avoidance and Disallowance Claims"). [ECF Doc. 21].

Southstar has moved to dismiss all claims asserted in the Amended Complaint under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

---

[1] FCA filed the Adversary Proceeding after acknowledging that the relief it requested in the Turnover Motion could only be obtained through the filing of an adversary proceeding. *See* FED. R. BANKR. P. 7001(1).

**FACTS AS ALLEGED BY FCA IN THE AMENDED COMPLAINT**

FCA and certain of its affiliates (the "FCA Affiliates")[2] are in the construction business. *See* Compl. ¶ 16. During the COVID-19 pandemic, FCA obtained an Economic Injury Disaster Loan from the Small Business Administration (the "SBA") and an SBA 7(a) loan through Newtek Small Business Finance, LLC ("Newtek"). *See* Compl. ¶ 19. SBA and Newtek received first-priority and second-priority liens on all of FCA's assets, respectively. *Id.*

In need of additional capital, FCA and the FCA Affiliates entered into a series of factoring documents with Southstar on December 12, 2022, which granted Southstar a standing option to purchase certain of FCA's and FCA Affiliates' accounts receivables at a discount, thereby providing FCA and the FCA Affiliates with immediate cash. *See* Compl. ¶ 23. The parties executed a total of three agreements, including a Non-Recourse Factoring and Security Agreement (the "Factoring Agreement"). *See* Compl. ¶ 16 & Ex. A. Prior to executing any of the factoring documents, FCA notified Southstar of the existence of the SBA and Newtek liens. *See* Compl. ¶¶ 20–21. Southstar accepted FCA's grant of a third-priority lien on all of FCA's assets as security under the Factoring Agreement. *Id.*

Under the Factoring Agreement, Southstar had the right to purchase accounts receivable from FCA at "an amount up to eighty percent (80%) of the face amount thereof, or such lesser percentage as [Southstar] and [FCA] shall agree upon" (the "Purchase Price"). Compl. ¶¶ 24–25 & Ex. A. FCA was also entitled to a rebate upon Southstar's receipt of payment on a purchased account receivable, provided that FCA was not in default under the Factoring Agreement (the "Rebate"). Compl. ¶ 44 & Ex. A. The Rebate is defined as

---

[2] The FCA Affiliates include CFM Disaster Recovery Services, LLC; FCA Construction, LLC; FCA Electrical Services, LLC; FCA Equipment, LLC; FCA Mechanical, LLC; FCA Plumbing, LLC; and FCA Roofing, LLC.

>the difference between the amount of aggregate receipt of payments on the [account receivable], less the sum of (a) the . . . Purchase Price . . . , (b) all Charges or other amounts or accruals then due [to Southstar] from [FCA] under this [Factoring] Agreement, and (c) any reserves [Southstar] elects to establish to secure payment of any other [p]urchased [a]ccounts [receivable].

Compl. ¶ 44 & Ex. A.

Southstar had the right to contact and collect accounts receivable from FCA's customers directly only on the accounts receivable it purchased. *See* Compl. ¶¶ 26–27 & Ex. A. But Southstar also sent notices of assignment of accounts receivable to FCA's customers on accounts receivable it had not purchased under the Factoring Agreement. *See* Compl. ¶ 28.

On August 29, 2023, FCA and the FCA Affiliates filed a Complaint against Southstar in the U.S. District Court for the Eastern District of Louisiana ("EDLA"), asserting state law causes of action against Southstar related to the Factoring Agreement. *Id.*; *CFM Disaster Recovery Servs., L.L.C., et al. v. SouthStar Fin., L.L.C.*, No. 2:23-cv-04847-JTM-MBN (E.D. La.). Upon Southstar's motion, the EDLA transferred that case to the U.S. District Court for the District of South Carolina, where it is currently pending. *See* Compl. ¶ 30.

Two days later, on August 31, 2023, Southstar sent FCA a "Notice of Breach" (the "Termination Notice"). *See* Compl. ¶ 29 & Ex. D. The Termination Notice provided that "[d]ue to the severity of [FCA's alleged] defaults, this is Southstar's final notice of breach and notice that Southstar has no intention of continuing to fund under our Factoring & Security Agreement." *See* Compl. ¶ 29 & Ex. D. The Termination Notice further demanded full payment in the amount $514,592.97, plus any outstanding or pending legal fees, representing Southstar's tally of amounts owed under the Factoring Agreement. *See* Compl. ¶ 29 & Ex. D.

Southstar continued to collect accounts receivable on both factored and unfactored accounts receivable following the Termination Notice. *See* Compl. ¶¶ 30, 33 & 35. After

4

collecting accounts receivable, Southstar placed the funds into either an escrow account or unfactored-receipts account. *See* Compl. ¶ 31. Southstar has collected $312,718.42 from unfactored accounts receivable. *See* Compl. ¶ 33. As early as November 16, 2023, Southstar held enough in the escrow and unfactored receipts accounts to satisfy any remaining balance owed to Southstar under the Factoring Agreement. *See* Compl. ¶ 31 & Ex. E. But Southstar refused to apply those collections toward the balance it alleged was owed by FCA under the Factoring Agreement until January 12, 2024. *See* Compl. ¶¶ 32–34. At that time, Southstar set off a portion of the accounts receivable collected against amounts it claimed FCA owed under the Factoring Agreement. Since then, Southstar has not asserted that FCA owes any additional fees or expenses under the Factoring Agreement, and FCA's account balance has remained $0.00. *See* Compl. ¶ 34. Southstar continues, however, to hold funds in an unfactored-receipts account. *Id.*

Nevertheless, Southstar continued to collect unfactored accounts receivable, charge the escrow account, and transfer unfactored receipts into the escrow account. *See* Compl. ¶¶ 35–40 & Ex. G. On February 6, 2024, Southstar transferred $50,466.75 from the escrow account to pay for its own attorney's fees (the "Attorney Fee Charge"). *See* Compl. ¶ 37 & Ex. G. Although Southstar may have been entitled to charge for certain fees under the Factoring Agreement, it overcharged FCA by approximately $99,933.89. *See* Compl. ¶ 49. On March 5, 2024, Southstar collected an unfactored account receivable in the amount of $125,893.77. *See* Compl. ¶ 38. Southstar transferred the remaining balance in the unfactored receipts account to the escrow account just prior to FCA filing a petition for bankruptcy relief. *See* Compl. ¶ 39. As of April 11, 2024, the Petition Date, Southstar held $226,717.39 of cash in the escrow account (the "Escrowed Funds"), *see* Compl. ¶ 40, while continuing to maintain a $0.00 balance due from FCA under the Factoring Agreement, *see* Compl. ¶ 41 & Ex. J.

5

In sum, Southstar has collected a total of $5,406,819.64 under the Factoring Agreement, approximately $32,000 more than the face value of the accounts receivable purchased by Southstar. *See* Compl. ¶ 43, 47 & Ex. L. But FCA only received $3,173,517.88 in advances and Rebates from Southstar, or approximately 58.6% of the accounts receivable collected under the Factoring Agreement. *See* Compl. ¶ 48. Southstar often refused to pay the agreed-upon 80% of the face value of the purchased accounts receivable and, instead, would use "its disproportionate negotiating power to dictate [a] lower" Purchase Price for FCA's accounts receivable. Compl. ¶¶ 45–46. Only 10 of the 51 accounts receivable that Southstar purchased received an 80% advance. *See* Compl. ¶¶ 45. After reaching an "agreed upon" reduced rate for an account receivable, Southstar diverted portions of the Purchase Price to the escrow or reserve accounts. Compl. ¶ 46. FCA regularly received less than the Purchase Price and Rebate it was owed under the Factoring Agreement and, occasionally, received nothing for a factored account receivable. *Id.* Thus, Southstar received approximately $2,201,296 in fraudulent transfers (the "Overpayment"). *See* Compl. ¶ 79.

## DISCUSSION

Southstar asks this Court to dismiss all of FCA's claims alleged in the *Amended Complaint* under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). First, Southstar contends that this Court lacks subject-matter jurisdiction to hear the Turnover Claims because those claims stem from a purely state-law contractual dispute and, therefore, those claims are not "core proceedings" as that term is used in 28 U.S.C. § 157(b).[3] Second, Southstar asserts that FCA's Avoidance and

---

[3] The Court interprets Southstar's request to dismiss FCA's claim for declaratory judgment in favor allowing of the South Carolina state court litigation to proceed as a request to abstain permissively under 28 U.S.C. § 1334. That statute provides:

> Except with respect to a case under chapter 15 of title 11, nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or

6

Disallowance Claims do not meet pleading standards required by Rule 8(a) of the Federal Rules of Civil Procedure or *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007).

A. **Standards of Review Under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure**

When a Rule 12(b)(1) motion is filed in conjunction with a Rule 12(b)(6) motion, "the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (internal citations omitted). "This requirement prevents a court without jurisdiction from prematurely dismissing a case with prejudice." *Id.*

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, "[a] case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998) (citing *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir.1996)). The burden of proof for a Rule 12(b)(1) motion is on the party asserting the Court's jurisdiction. *See Ramming*, 281 F.3d at 161; *In re Hotop*, No. 14-12204, 2015 WL

---

respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

28 U.S.C. § 1334(c)(1). "Abstention is an extraordinary and narrow exception to the duty of a federal court to exercise the jurisdiction conferred and adjudicate a controversy properly before it." *Foster v. Holder (In re Foster)*, No. 19-04131, 2020 WL 6127915, at *18 (Bankr. N.D. Tex. Oct. 15, 2020), *aff'd*, *Foster v. Aurzada (In re Foster)*, No. 22-10310, 2023 WL 20872 (5th Cir. Jan. 3, 2023). Courts have identified several factors that may be considered when determining whether to postpone the exercise of its jurisdiction, including (1) the convenience of the forum; (2) the presence of non-debtors; (3) whether the case should be tried in state court; (4) judicial efficiency; (5) the possibility of inconsistent results; (6) whether the state court could better handle the issues of state law; (7) the expertise of the Bankruptcy Court; (8) the degree of relation to the main bankruptcy case; (9) prejudice to involuntarily removed parties; (10) whether the case involves forum shopping; (11) the burden on the Bankruptcy Court's docket; and (12) considerations of comity. *See Doe v. Archdiocese of New Orleans Indemnity, Inc.*, No. 20-1338, 2020 WL 4593443, at *4 (E.D. La. Aug. 11, 2020). Because the Court finds that all of the claims in the Amended Complaint constitute "core proceedings" that this Court may hear and determine on a final basis, the Court declines to exercise its discretion to abstain from hearing the Adversary Proceeding.

3793102, at *2 (Bankr. E.D. La. June 16, 2015). In deciding a Rule 12(b)(1) motion, "the Court is permitted to look at evidence in the record beyond simply those facts alleged in the complaint and its proper attachments." *Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233, 238 (5th Cir. 2009). The reason for that is simple:

> A motion to dismiss under Rule 12(b)(1) is characterized as either facial or factual. *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir.1980). A facial attack is based solely upon the complaint itself, whereas "[a] 'factual attack' . . . challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *Id.* (citation omitted). "The district court consequently has the power to dismiss for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir.1981).

*In re Fugitt*, No. 13-03094, 2014 WL 3888281, at *5 (Bankr. S.D. Miss. Aug. 8, 2014).

If subject-matter jurisdiction exists, then a court may dismiss a complaint, or any part of it under Rule 12(b)(6) of the Federal Rules of Civil Procedure, for failure to state a claim upon which relief may be granted if the plaintiff has not set forth factual allegations in support of his claim that would entitle him to relief. *Twombly*, 550 U.S. at 555; *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007). A motion to dismiss under Rule 12(b)(6) "is viewed with disfavor and is rarely granted." *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982) (internal quotations and citations omitted); *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005). In deciding a Rule 12(b)(6) motion, this Court must "accept all well-pleaded facts as true and view all facts in the light most favorable to the plaintiff." *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502 (5th Cir. 2014).

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*,

8

556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court, however, does not accept as true legal conclusions or mere conclusory statements; indeed, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" or "naked assertion[s] devoid of further factual enhancement" are not sufficient. *Id.* (internal quotations and citations omitted).

But "[a]sking for [such] plausible grounds to infer the [the elements of a claim] does not impose a probability requirement at the pleading stage." *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (emphasis omitted). Rather, the Court must simply determine whether, "under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotations and citations omitted); s*ee also Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012) (en banc) ("Our task, then, is to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success." (internal quotations and citations omitted)). Indeed, "[c]ourts do not make plausibility determinations in a vacuum; it is a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S & B Holdings LLC)*, 420 B.R. 112, 132 (Bankr. S.D.N.Y. 2009) (quoting *Iqbal*, 556 U.S. at 679).

Lastly, "[t]he Court's function on a motion to dismiss is 'not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient.'" *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 295

9

F. Supp. 2d 366, 372 (S.D.N.Y. 2003) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)).

For the following reasons, the Court finds that it has subject-matter jurisdiction to hear and decide the Turnover Claims alleged in the Complaint (Counts One and Two) and thus denies the Motion To Dismiss to the extent it seeks relief under Rule 12(b)(1). The Court further finds that FCA has adequately pleaded the claims in Counts Three, Four, and Five, and denies the Motion To Dismiss to the extent it seeks dismissal of those claims under Rule 12(b)(6). Finally, the Court denies the Motion To Dismiss as to Count Six as premature.[4]

**B. The Turnover Claims Are "Core Proceedings" That This Court May Hear and Determine on a Final Basis.**

Section 1334 of Title 28 of the United States Code grants district courts "original and exclusive jurisdiction" over all cases "under title 11," that is, the Bankruptcy Code. 28 U.S.C. § 1334(a). Under § 1334, district courts also enjoy "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). As discussed below, "[t]he distinction between cases that 'arise under' or 'arise in' Title 11, on the one hand, and cases that are 'related to' Title 11, on the other hand, 'has significance as a jurisdictional consideration.'" *Hadi v. McCune Wright Arevalo LLP*, No. 18-CV-05104, 2018 WL 6675622, at *3 (C.D. Cal. Dec. 17, 2018) (quoting *In re Harris Pine Mills*, 44 F.3d 1431, 1435 (9th Cir. 1995)).

---

[4] Section 502 of the Bankruptcy Code governs allowance of claims or interests. Claim Six of the Complaint asks this Court to disallow "any and all Claims" of Southstar under §§ 502(d) and (j). The deadline for filing proofs of claim against FCA was May 31, 2024. [No. 24-10702, ECF Doc. 42]. Because Southstar has not filed a proof of claim in FCA's bankruptcy case, § 502 is not implicated and thus its inclusion as a basis for relief in the Complaint is premature.

10

"The bankruptcy courts in turn draw their jurisdiction from the district courts under 28 U.S.C. § 157(a)." *Foster v. Aurzada (In re Foster)*, No. 22-10310, 2023 WL 20872, at *2 (5th Cir. Jan. 3, 2023) (internal quotations and citation omitted). "A bankruptcy court's statutory authority derives from 28 U.S.C. § 157(b)(1), which designates certain matters as 'core proceedings' and authorizes a bankruptcy court to determine the matters and enter final judgments." *Galaz v. Katona (In re Galaz)*, 841 F.3d 316, 323 (5th Cir. 2016) (citation omitted). Section 157(b)(2) provides a non-exclusive list of proceedings that are considered to be "core proceedings," including "matters concerning the administration of the estate" and "orders to turn over property of the estate. . . ." 28 U.S.C. § 157(b)(2)(A) & (E). To distinguish "core" from "non-core" proceedings, the Fifth Circuit has explained:

> Congress used the phrase "arising under title 11" to describe those proceedings that involve a cause of action created or determined by a statutory provision of title 11. Apparently, the phrase was taken from 28 U.S.C. § 1331, conferring federal jurisdiction in which it carries a similar and well-accepted meaning. The meaning of "arising in" proceedings is less clear, but seems to be a reference to those "administrative" matters that arise only in bankruptcy cases. In other words, "arising in" proceedings are those that are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy.
>
> As defined above, the phrases "arising under" and "arising in" are helpful indicators of the meaning of core proceedings. If the proceeding involves a right created by the federal bankruptcy law, it is a core proceeding; for example, an action by the trustee to avoid a preference. If the proceeding is one that would arise only in bankruptcy, it is also a core proceeding; for example, the filing of a proof of claim or an objection to the discharge of a particular debt. If the proceeding does not invoke a substantive right created by the federal bankruptcy law and is one that could exist outside of bankruptcy it is not a core proceeding; it may be related to the bankruptcy because of its potential effect, but under section 157(c)(1) it is an "otherwise related" or non-core proceeding.

*WRT Creditors Liquidation Tr. v. C.I.B.C. Oppenheimer Corp.*, 75 F. Supp. 2d 596, 607 (S.D. Tex. 1999) (quoting *In re Wood*, 825 F.2d 90, 96–97 (5th Cir. 1987)).

11

This Court is responsible for determining "whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11." 28 U.S.C. § 157(b)(3). "A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law." *Id.*; *see also Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.)*, 163 F.3d 925, 931 (5th Cir. 1999) ("To begin with, the state law origin of [plaintiff's] claims is not dispositive. . . . That [plaintiff's] claims against the court-appointed accountant for its examiner arose under state law does not prevent them from involving core jurisdiction.").

The Turnover Claims alleged by the FCA consist of (i) a determination of whether the Escrowed Funds are property of the estate under 11 U.S.C. § 541 (Count One), and (ii) if so, whether Southstar must turnover the Escrowed Funds to the debtor pursuant to 11 U.S.C. § 542 (Count Two). A "[d]ebtor's claim[] for declaratory relief and for turnover of estate assets are core proceedings because they are 'matters concerning the administration of the estate' and 'orders to turn over property of the estate,' under 28 U.S.C. § 157(b)(2)(A) and (E)." *In re Point Blank Sols., Inc.*, 449 B.R. 446, 450 (Bankr. D. Del. 2011); *see also In re Envision Healthcare Corp.*, 655 B.R. 701, 709 (Bankr. S.D. Tex. 2023) ("A proceeding to determine whether a debtor's interest in property is 'property of the estate' is a core proceeding under § 157(b)(2)(A)." (citation omitted)). Indeed, "[w]henever there is a dispute regarding whether property is property of the bankruptcy estate, exclusive jurisdiction is in the bankruptcy court." *Manges v. Atlas (In re Duval Cnty. Ranch Co.)*, 167 B.R. 848, 849 (Bankr. S.D. Tex. 1994) (citing *Slay Warehousing Co. v. Modern Boats, Inc.*, 775 F.2d 619, 620 (5th Cir.1985)).

Here, the fact that the dispute may involve the application of Louisiana or South Carolina state law does not undermine the "core" characterization of the claims. *See* 28 U.S.C. § 157(b)(3);

*Point Blank Sols.*, 449 B.R. at 449–50; *Crown Village Farm v. ARL, L.L.C. (In re Crown Village Farm, LLC)*, 415 B.R. 86, 96 (Bankr. D. Del. 2009). Because the Turnover Claims would arise only in the context of bankruptcy proceedings, the Court finds that the Turnover Claims are "core proceedings" that it may hear and determine on a final basis. For that reason, this Court possesses subject-matter jurisdiction over the Turnover Claims alleged in the Amended Complaint.

### C. FCA Has Stated a Plausible Claim Against Southstar for Avoidance of Fraudulent Transfers Under 11 U.S.C. § 548.

In Count Three of the Amended Complaint, FCA alleges that the Attorney Fee Charge and the Overpayment that Southstar received constitute constructively fraudulent transfers which FCA is entitled to recover under 11 U.S.C. § 548(a)(1)(B).

Section 548(a)(1)(B) of the Bankruptcy Code authorizes the debtor-in-possession to avoid transfers of interests in the debtor's property occurring within two years prior to the petition date if the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation" and the debtor either "(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred . . . ; (II) was engaged in business or a transaction . . . for which any property remaining with the debtor was an unreasonably small capital; [or] (III) intended to incur . . . debts that would be beyond the debtor's ability to pay as such debts matured . . . ." 11 U.S.C. § 548(a)(1)(B). Thus, to survive a motion to dismiss, a constructive fraudulent transfer claim predicated on the foregoing provisions must allege sufficient facts that plausibly show: (i) a transfer within the applicable time period; (ii) a lack of reasonably equivalent value (or fair consideration); and (iii) either (a) the debtor's insolvency; (b) the debtor's lack of capital to fund ongoing business or transactions; or (c) the debtor intended to incur debts beyond its ability to pay. *Id.*

13

FCA's Amended Complaint sufficiently pleaded that the Attorney Fee Charge and the Overpayment occurred within the two years prior to FCA's petition date. *See* Compl. ¶¶ 37, 47, 60 & Ex. G. Indeed, the parties executed the Factoring Agreement on December 12, 2022, approximately 16 months prior to the Petition Date, so the entirety of the parties' dealings under the Factoring Agreement occurred within the two years prior to the petition date. *See* Compl. ¶ 23.

The Amended Complaint also sufficiently pleaded a lack of reasonably equivalent value. The analysis regarding reasonably equivalent value is inherently fact-driven. *See In re Charys Holding Co.*, No. 08-10289, 2010 WL 2774852, at *7 (Bankr. D. Del. July 14, 2010). As explained by one court,

> "[r]easonably equivalent value" means that the debtor has received value that is substantially comparable to the worth of the transferred property. To measure reasonably equivalent value, for purposes of the fraudulent transfer section of the Bankruptcy Code, courts judge the consideration given for a transfer from the standpoint of creditors: the proper focus is on the net effect of the transfers on the debtor's estate, and the funds available to the unsecured creditors.

*In re Clear the Air, LLC*, 631 B.R. 286, 297 (Bankr. S.D. Tex. 2021). FCA has sufficiently pleaded that it did not receive reasonably equivalent value under the Factoring Agreement. FCA alleges that Southstar continued to charge FCA despite a lack of any agreement, any actual borrowing, or any remaining balance due after Southstar sent the Termination Notice. *See* Compl. ¶¶ 36, 45–46, 49. The Attorney Fee Charge went toward Southstar's attorneys' fees; FCA received nothing in return. *See* Compl. ¶¶ 37, 50. FCA also alleges that it did not receive what it had bargained for under the Factoring Agreement. FCA alleges that it frequently received less than the "agreed upon" 80% Purchase Price for a purchased account receivable. *See* Compl. ¶ 46. FCA also alleges that occasionally, it received nothing for a purchased account receivable. *Id.*

The Amended Complaint also sufficiently pleaded that FCA was insolvent, lacked capital, and intended to incur debts beyond its ability to pay. The Amended Complaint alleges that FCA often faced cash-flow issues, and the factoring arrangement with Southstar was one of the solutions to combat that issue. *See* Compl. ¶¶ 16–17. FCA further alleges that Southstar's behavior under the Factoring Agreement "has caused substantial harm to Debtor's business relationships." *See* Compl. ¶ 18. Taking FCA's allegations as true and making any inferences in favor of FCA, FCA has adequately alleged that it was insolvent, lacked capital to fund ongoing business arrangements, and incurred debts beyond its ability to pay at the time of the allegedly fraudulent transfers.

The Motion To Dismiss is denied as to Count Three.

**D. FCA Has Stated a Plausible Claim Against Southstar for Avoidance of Preference Payments Under 11 U.S.C. § 547.**

In Count Four of the Amended Complaint, FCA alleges that the Attorney Fee Charge was a preference payment to Southstar which FCA is entitled to avoid under 11 U.S.C. § 547. Section 547 provides that the debtor-in-possession "may avoid any transfer of an interest of the debtor in property:

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—(A) on or within 90 days before the date of the filing of the petition; . . . and

(5) that enables such creditor to receive more than such creditor would receive if—(A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). Thus, to survive a motion to dismiss, a claim to avoid a preference payment must allege sufficient facts that plausibly show: (i) a transfer was made to a creditor; (ii) the transfer was made on account an antecedent debt; (iii) the transfer was made while the debtor was insolvent; (iv) the transfer was made within 90 days before the debtor's petition date; and (v) the transfer enabled the creditor to receive more than it would have in a chapter 7 liquidation had the transfer not been completed and the creditor received payment to extent provided by the Bankruptcy Code. *Id.*

FCA has sufficiently pleaded that the Attorney Fee Charge was made to Southstar who, at the time the transfer was made, was a creditor. *See* Compl. ¶ 37 & Ex. G. FCA has sufficiently pleaded that the Attorney Fee Charge was made on account of an antecedent debt because Southstar charged FCA for attorney's fees that Southstar alleged were owed by FCA under the Factoring Agreement. *Id.* The Amended Complaint also alleges that the Attorney Fee Charge occurred on February 6, 2024, or 65 days prior to FCA's petition date of April 11, 2024. *See* Compl. ¶ 50. For the purposes of avoiding preference payments, "the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." 11 U.S.C. § 547(f). Thus, FCA has sufficiently pleaded that the Attorney Fee Charge occurred while FCA was insolvent and within 90 days of the Petition Date.

Lastly, the Amended Complaint alleges that, although Southstar has received full payment of the debt owed to it under the Factoring Agreement, *see* Compl. ¶¶ 32, 41–42, it has not remitted the Attorney Fee Charge. *See* Compl. ¶ 73. Thus, FCA has sufficiently pleaded that Southstar has received more than it would receive under a chapter 7 liquidation had the Attorney Fee Charge not occurred.

The Motion To Dismiss is denied as to Count Four.

### E. FCA Has Stated a Plausible Claim Against Southstar for Recovery of Avoided Transfers Under 11 U.S.C. § 550.

In Count Five of the Amended Complaint, FCA seeks to recover the Attorney Fee Charge and the Overpayment as avoided transfers pursuant to 11 U.S.C. § 550.

Section 550 of the Bankruptcy Code provides:

> Except as otherwise provided in this section, to the extent that a transfer is avoided under section . . . 547[ or] 548 . . . of this title, the [debtor-in-possession] may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550. Thus, to survive a motion to dismiss, a claim to recover avoided transfers must allege sufficient facts that plausibly show: (i) a transfer is avoidable under § 547 or § 548 of the Bankruptcy Code and (ii) the party in possession of the property is either (a) the initial transferee or the entity for whose benefit the transfer was made or (b) an immediate or mediate transferee of the initial transferee. *Id.*

As described above, FCA has sufficiently pleaded in Counts Three and Four that the Attorney Fee Charge and the Overpayment are avoidable under either § 547 or § 548 of the Bankruptcy Code. *See supra* Subparts C & D; Compl. ¶¶ 64–75. FCA has sufficiently pleaded that FCA was the initial transferee of each avoidable transfer because Southstar collected directly from FCA's customers. *See* Compl. ¶¶ 37, 47–48. Lastly, FCA has sufficiently pleaded that Southstar was the entity for whose benefit the transfers were made because it escrowed the amounts collected and charged FCA's account. *See* Compl. ¶¶ 37–50.

Thus, the Motion To Dismiss is denied as to Count Five.

## CONCLUSION

Accordingly,

**IT IS ORDERED** that the Motion To Dismiss is **DENIED**.

**IT IS FURTHER ORDERED** that the Motion To Set Hearing is **DENIED as MOOT**.

New Orleans, Louisiana, November 8, 2024.

_____
MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE