**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: | § | CASE NO: 24-10702 |
| FCA CONSTRUCTION LLC, | § | CHAPTER 11 |
| DEBTOR. | § | SECTION A |
| | § | |
| FCA CONSTRUCTION LLC, | § | |
| PLAINTIFF, | § | |
| V. | § | ADV. NO. 24-1007 |
| SOUTHSTAR FINANCIAL, LLC, | § | |
| DEFENDANT. | § | |

**MEMORANDUM OPINION AND ORDER**

The first two counts in the *Amended Complaint* filed by FCA Construction, LLC, ("FCA"), in the above-captioned adversary proceeding seek (i) a declaratory judgment that $226,717.39 held by Southstar in escrow is property of FCA's bankruptcy estate (Count 1) and (ii) turnover of those escrowed funds to FCA as a debtor-in-possession pursuant to 11 U.S.C. § 542 (Count 2) (together, the "Turnover Claims"). [ECF Doc. 21]. The *Amended Complaint* includes four additional causes of action against Southstar: (i) avoidance of fraudulent transfers under 11 U.S.C. § 548 (Count 3); (ii) avoidance of preference payments under 11 U.S.C. § 547 (Count 4); (iii) recovery of avoided transfers under 11 U.S.C. § 550 (Count 5); and (iv) disallowance of all Southstar's claims under 11 U.S.C. § 502 (Count 6). *Id.* The Answer to the Complaint filed by Southstar Financial, LLC ("Southstar"), contains a counterclaim for declaratory judgment that the escrowed funds are property of Southstar. [ECF Doc. 55].

Before the Court is the Corrected *Defendant Southstar Financial, LLC's Motion For Summary Judgment and Incorporated Supporting Memorandum of Law* (the "Motion"), [ECF Docs. 65], and the statement of uncontested facts in support of the Motion, [ECF Doc. 58], filed by Southstar Financial, LLC ("Southstar").[1] The Motion seeks summary judgment on Counts 1 through 5 alleged in the *Amended Complaint* as well as the Counterclaim. FCA filed an opposition to the Motion and a statement of uncontested facts in support of its opposition. [ECF Doc. 60]. Southstar filed a reply in support of the Motion. [ECF Doc. 61].

For the following reasons, the Court **DENIES** the Motion.

## JURISDICTION AND VENUE

This Court has jurisdiction to grant the relief provided for herein pursuant to 28 U.S.C. § 1334. The matters presently before the Court constitute core proceedings that this Court may hear and determine on a final basis under 28 U.S.C. § 157(b)(2)(B). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## DISCUSSION

The parties agree upon or do not dispute the following facts:

1. On December 12, 2022, FCA and certain of its affiliates (the "FCA Affiliates")[2] executed three agreements with Southstar, including a Non-Recourse Factoring and Security Agreement (the "Factoring Agreement"). [ECF Doc. 65-8; ECF Doc. 58, ¶ 1; ECF Doc. 60-1, ¶ 1].

---

[1] Southstar's corrected motion for summary judgment removed the red-line edits and comments in its original motion. *See* [ECF Doc. 57].

[2] The FCA Affiliates include CFM Disaster Recovery Services, LLC; FCA Construction, LLC; FCA Electrical Services, LLC; FCA Equipment, LLC; FCA Mechanical, LLC; FCA Plumbing, LLC; and FCA Roofing, LLC.

2. Albert Courcelle ("Courcelle"), as a member and authorized representative of FCA and the FCA Affiliates, executed the Factoring Agreement. [ECF Doc. 58, ¶ 2; ECF Doc. 60-1, ¶ 2].

3. The Factoring Agreement granted Southstar a standing option to purchase certain of FCA's and FCA Affiliates' accounts receivables at a discount. [ECF Doc. 65-8, ¶ 1; ECF Doc. 58, ¶ 11; ECF Doc. 60-1, ¶ 11].

4. Southstar would purchase the accounts receivable for "an amount up to eighty percent (80%) of the face amount" of the account receivable, or "such lesser percentage" as agreed upon by Southstar and FCA. [ECF Doc. 65-8, ¶ 2; ECF Doc. 58, ¶¶ 10, 28; ECF Doc. 60-1, ¶¶ 10, 28].

5. The "total outstanding funds sent from [Southstar] to [FCA] to purchase the [accounts receivable would] not exceed $4,000,000.00." [ECF Doc. 65-8, ¶ 1; ECF Doc. 58, ¶ 4; ECF Doc. 60-1, ¶ 4].

6. Southstar retained the exclusive right to reduce or increase the maximum amount of the payments. [ECF Doc. 65-8, ¶ 1].

7. The Initial Term of the Factoring Agreement was for "twenty-four (24) months from the first day of the month following the date of the first Purchased Account [Receivable]." [ECF Doc. 65-8, ¶ 11(a); ECF Doc. 58, ¶ 3; ECF Doc. 60-1, ¶ 3].

8. The Initial Term would automatically renew for an additional twenty-four months unless Southstar terminated the Factoring Agreement. [ECF Doc. 65-8, ¶ 1].

9. The Factoring Agreement granted Southstar the right to "establish a reserve account and holdback from payments due to [FCA] . . . in order to provide adequate security" if Southstar

believed in good faith that FCA was in default. [ECF Doc. 65-8, ¶ 7; ECF Doc. 58, ¶ 5, 7; ECF Doc. 601, ¶ 5, 7].

10. If FCA defaulted under the Factoring Agreement, then Southstar

shall also have the right in its name to compromise or extend the time for payment of any Account [Receivable] for such amounts, and upon such terms as [Southstar] may determine; to demand, collect, receive and sue for any and all amounts due or to become due on the Accounts [Receivable], and to take control of cash and other proceeds of any Accounts [Receivable].

[ECF Doc. 65-8, ¶6; ECF Doc. 58, ¶ 8; ECF Doc. 60-1, ¶ 8].

11. Other remedies available to Southstar upon FCA's default included the right to terminate the Factoring Agreement and take control of goods relating to any Account Receivable. [ECF Doc. 65-8, ¶ 10(b); ECF Doc. 58, ¶ 9; ECF Doc. 60-1, ¶ 9].

12. Additionally, FCA was required to pay Southstar for "all other damages, costs and losses caused to [FCA] by reason of such Default, including, but not limited to reasonable attorneys' fees, court costs, other collection expenses and all other expenses and costs incurred or paid by [Southstar] to obtain performance or to enforce any covenant or agreement." [ECF Doc. 65-8, ¶ 10(b); ECF Doc. 58, ¶ 9; ECF Doc. 60-1, ¶ 9].

13. Southstar first held back funds in the reserve escrow account on or about December 28, 2022. [ECF Doc. 58, ¶ 12; ECF Doc. 60-1, ¶ 12].

14. Southstar paid a minimum of $600,000.00 to FCA's suppliers, subcontractors, and other dealers under the Factoring Agreement. [ECF Doc. 65-12; ECF Doc. 58, ¶¶ 29-30; ECF Doc. 60-1, ¶¶ 29-30].

15. Although the parties dispute whether and to what extent FCA breached the Factoring Agreement, Southstar sent three notices of default to FCA between April 20, 2023, and August 31, 2023. [ECF Doc. 65-5–7; ECF Doc. 58, ¶ 15; ECF Doc. 60-1, ¶ 15].

16. On August 27, 2023, FCA and the FCA Affiliates filed suit against Southstar in the U.S. District Court for the Eastern District of Louisiana. [ECF Doc. 58, ¶ 16; ECF Doc. 60-1, ¶ 16].

17. The suit was eventually transferred to the U.S. District Court for the District of South Carolina, and a two-day evidentiary hearing was held on FCA's motion for a preliminary injunction (the "TRO Hearing"). [ECF Doc. 65-2; ECF Doc. 58, ¶ 16; ECF Doc. 60-1, ¶ 16].

18. During the TRO Hearing, Courcelle testified on behalf of FCA and the FCA Affiliates and Scott Norris and Lori Wolff testified on behalf of Southstar. [ECF Doc. 58, ¶ 17; ECF Doc. 60-1, ¶ 17].

19. Courcelle testified that the payoff balance included in a "January 8th letter" was actually higher because the "factor due" did not include legal fees or misdirected fee payments. [ECF Doc. 65-4 at 99:1–100:25; ECF Doc. 58, ¶ 18; ECF Doc. 60-1, ¶ 18].

20. Scott Norris, the corporate representative of Southstar, also submitted a declaration attesting that the "'factor due' amount fails to account for obligations under the Factoring Agreement such as reserve amounts, legal and indemnification obligations owing and continuing to accrue, mandatory monthly minimums, default fees, and other obligations set forth in the Factoring Agreement." [ECF Doc. 65-11, ¶¶ 19-20].[3]

21. On January 29, 2024, the South Carolina District Court denied FCA's motion for a preliminary injunction. [ECF Doc. 65-3; ECF Doc. 58, ¶ 20; ECF Doc. 60-1, ¶ 20].

---

[3] Southstar also cites to a portion of Mr. Norris's testimony at the TRO Hearing which is not included in Exhibit 3 to the Motion.

22. On February 6, 2024, Southstar deducted $50,466.75 from the reserve escrow account for attorneys' fees for Southstar's outside counsel involved in the litigation with FCA (the "Attorney Fee Charge"). [ECF Doc. 65-12; ECF Doc. 58, ¶ 27; ECF Doc. 60-1, ¶ 27].

23. On April 11, 2024, FCA filed its petition for bankruptcy relief under chapter 11 of the Bankruptcy Code. [Case No. 24-10702, ECF Doc. 1].

24. FCA's bankruptcy stayed the South Carolina District Court's ruling on Southstar's motion for summary judgment. [ECF Doc. 58, ¶¶ 20-21; ECF Doc. 60-1, ¶¶ 20-21].

25. As of April 11, 2024, Southstar held $226,717.39 in the reserve escrow account. [ECF Doc. 65-12; ECF Doc. 58, ¶ 2; ECF Doc. 60-1, ¶ 22].

26. Along with several other "first-day motions," FCA filed an *Emergency Motion For Turnover of Property of the Estate* (the "Turnover Motion"), [No. 24-10702, ECF Doc. 9].

27. On April 23, 2024, FCA filed the above-captioned adversary proceeding against Southstar seeking the same relief as in the Turnover Motion (the "Adversary Proceeding").[4] [ECF Doc. 1].

28. After a hearing on an emergency motion for a preliminary injunction, this Court consolidated the Turnover Motion within the Adversary Proceeding. [ECF Doc. 16].

## ANALYSIS

Southstar seeks summary judgment on Counts 1 through 5 of the *Amended Complaint* and the Counterclaim.[5] [ECF Doc. 65]. First, Southstar contends that the funds held in the reserve escrow account are Southstar's property, and, thus, seeks summary judgment against FCA on the

---

[4] FCA filed the Adversary Proceeding because the relief it requested in the Turnover Motion could only be obtained through the filing of an adversary proceeding. *See* FED. R. BANKR. P. 7001(1).

[5] For the reasons stated in this Court's *Memorandum Opinion and Order Denying Motion To Dismiss* dated November 8, 2024, Count 6 in the *Amended Complaint* is premature. [ECF Doc. 53].

6

Turnover Claims and in favor of Southstar on the Counterclaim. Second, Southstar contends that there is no genuine dispute that FCA received reasonably equivalent value for the alleged fraudulent transfers, so FCA's claim under 11 U.S.C. § 548 fails as a matter of law. Third, Southstar contends that there is no genuine dispute that either the escrowed funds are property of Southstar or that the Attorney Fee Charge was made in the ordinary course of business, so FCA's claim under 11 U.S.C. § 547 fails as a matter of law. Fourth, Southstar contends FCA cannot recover under 11 U.S.C. § 550 because Counts 3 and 4 fail as a matter of law.

### A. Summary Judgment Standard

A court grants summary judgment when the pleadings, discovery responses, and affidavits show no genuine dispute as to any material fact and the evidence entitles the movant to judgment at trial. FED. R. CIV. P. 56(a); FED. R. BANKR. P. 7056; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). No genuine dispute exists when "a rational trier of fact could not find for the [nonmovant] based upon the record evidence before the court." *James by James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). A court views the facts and evidence in the light most favorable to the nonmovant. *See Campo v. Allstate Ins. Co.*, 562 F.3d 751, 754 (5th Cir. 2009). If the movant fails to show an absence of a genuine issue of material fact, a court shall deny the movant's motion. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). If the movant succeeds, the nonmovant must go beyond the pleadings and designate facts that show a genuine issue. *See* FED. R. CIV. P. 56(c)(1). The Court cannot weigh the evidence at the summary judgment stage. *See Aubrey v. Sch. Bd. of Lafayette Par.*, 92 F.3d 316, 318 (5th Cir. 1996).

B. **A Genuine Issue of Material Fact Exists Regarding Who Owns the Escrowed Funds.**

Southstar seeks summary judgment on the issue of ownership of the funds held in the reserve escrow account. In support of its contention that the funds belong to it and are not property of the estate, Southstar alleges that FCA repeatedly breached the Factoring Agreement and was in default as early as January 2023. [ECF Doc. 65-5–7]. Thus, Southstar alleges that it had the right to establish and maintain the reserve escrow account under the Factoring Agreement. [ECF Doc. 65-8, ¶¶ 5, 6, 10]. According to Southstar, that right exists beyond the termination of the Factoring Agreement. *Id.* ¶ 10(b). Southstar maintains that the funds are held to cover its legal fees and costs related to the Factoring Agreement. But Southstar has presented no additional evidence regarding fees or costs it is currently owed. Indeed, Southstar's redacted legal fee report only details costs and fees that occurred prepetition for the period between August 31, 2023, and April 10, 2024. [ECF Doc. 65-18]. The billing status for all the costs and fees included in the report are also marked as "Completed." *Id.*

In response, FCA does not dispute that the Factoring Agreement gave Southstar the contractual right to create and establish the reserve escrow account under certain circumstances. But FCA disputes whether those conditions were met in the first place for Southstar to do so. FCA notes that the notices of termination upon which Southstar relies, [ECF Doc. 65-5–7], are merely notices and disputes their legal significance. Southstar has not provided any corroborating evidence that FCA was actually in default.

For similar reasons discussed in this Court's *Memorandum Opinion and Order* denying FCA's motion for partial summary judgment dated January 6, 2025, [ECF Doc. 69], this Court finds that Southstar has failed to meet its burden to obtain a grant of summary judgment as there

8

are genuine issues of material fact regarding ownership of the funds held in the reserve escrow account.

      **C.    A Genuine Issue of Material Fact Exists as to Whether FCA Received Reasonably Equivalent Value for the Alleged Fraudulent Transfers.**

In Count Three of the *Amended Complaint*, FCA alleges that the Attorney Fee Charge and the Overpayment[6] that Southstar received constitute constructively fraudulent transfers which FCA is entitled to recover under 11 U.S.C. § 548(a)(1)(B). Southstar contends that FCA received "reasonably equivalent value" for the alleged fraudulent transfers, such that Count Three fails as a matter of law.

Section 548(a)(1)(B) of the Bankruptcy Code authorizes the debtor-in-possession to avoid transfers of interests in the debtor's property occurring within two years prior to the petition date if the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation" and the debtor either "(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred . . . ; (II) was engaged in business or a transaction . . . for which any property remaining with the debtor was an unreasonably small capital; [or] (III) intended to incur . . . debts that would be beyond the debtor's ability to pay as such debts matured . . . ." 11 U.S.C. § 548(a)(1)(B). "If the Debtor receive[s] 'reasonably equivalent value,' then the transfer is not avoidable under the plain terms of § 548(a)(1)(B), regardless of whether any other criterion is met." *In re La. Pellets, Inc.*, No. 16-80162, 2019 WL 2565670, at *2 (Bankr. W.D. La. June 20, 2019), *subsequently aff'd sub nom. Matter of La. Pellets, Inc.*, 838 F. App'x 45 (5th Cir. 2020).

---

[6]     The Overpayment is the alleged $2,201,296 difference between the amount Southstar collected from FCA's accounts receivable and the amount of advances and rebates FCA received in return. *See* Compl. ¶ 79. FCA alleges that it regularly received less than the agreed upon purchase price and rebate it was owed under the Factoring Agreement and, occasionally, received nothing for a factored account receivable. *See* Compl. ¶ 46.

The analysis regarding reasonably equivalent value is inherently fact-driven. *See In re Charys Holding Co.*, No. 08-10289, 2010 WL 2774852, at *7 (Bankr. D. Del. July 14, 2010). As explained by one court,

> "[r]easonably equivalent value" means that the debtor has received value that is substantially comparable to the worth of the transferred property. To measure reasonably equivalent value, for purposes of the fraudulent transfer section of the Bankruptcy Code, courts judge the consideration given for a transfer from the standpoint of creditors: the proper focus is on the net effect of the transfers on the debtor's estate, and the funds available to the unsecured creditors.

*In re Clear the Air, LLC*, 631 B.R. 286, 297 (Bankr. S.D. Tex. 2021).

In support of its contention that FCA received "reasonably equivalent value" for the alleged fraudulent transfers, Southstar provides the declaration of Lori Wolff, Southstar's Senior Account Manager who handled FCA's account with Southstar. [ECF Doc. 65-1]. Wolff's declaration includes the "FCA Benefit Analysis Report" (the "Report"). [ECF Doc. 65-15]. The Report aggregates and categorizes the data contained in the Escrow Funds Breakdown Report, [ECF Doc. 65-13], and the Escrow Funds Breakdown Report, [ECF Doc. 65-14]. [ECF Doc. 65-1]. According to the Report, the total value of the purchased accounts receivable is $5,374,814.39. [ECF Doc. 65-15]. Southstar received $4,080,693.41 in gross advances from Southstar which represents 76% of the total value of the purchased accounts receivable. *Id.* When the rebates sent to FCA—which total $178,402.77—are included, FCA received approximately 79% of the total. *Id.* When considering the context within which the parties executed the Factoring Agreement and the fact that the Factoring Agreement includes an 80% purchase price, Southstar contends that by receiving approximately 76–79% of the value of the accounts receivable, FCA has received reasonably equivalent value for the alleged fraudulent transactions.

In response, FCA contends that Southstar actually received $6,032,554.25. FCA further contends that the advances and rebates sent to FCA are a misnomer because FCA did not actually

receive certain funds. Specifically, FCA contends that $510,024,33 of advances and $528,254.98 of rebates were actually diverted to the reserve escrow account. [ECF Doc. 65-14]. The Escrow Funds Breakdown Report also shows that $569,419.36 collected from unfactored accounts receivable were deposited into the reserve escrow account. *Id.* Additionally, FCA contends that the $1,328,919.50 listed in the Report as the total payments from the reserve escrow account made for FCA's benefit is inaccurate. Specifically, FCA contends that $456,460.60 was used for chargebacks which did not benefit FCA. [ECF Doc. 65-12].

The Court finds that Southstar has failed to meet its burden of demonstrating that no genuine issue of material fact exists regarding whether FCA received reasonably equivalent value for the alleged fraudulent transfers.

> **D.     A Genuine Issue of Material Facts Exists as to Whether the Attorney Fee Charge Was Made in the Ordinary Course.**

In Count Four of the *Amended Complaint*, FCA alleges that the Attorney Fee Charge was a preference payment to Southstar which FCA is entitled to avoid under 11 U.S.C. § 547. Southstar contends that the Attorney Fee Charge was made in the ordinary course of business, such that Count Four fails as a matter of law.[7]

Section 547 provides that the debtor-in-possession "may avoid any transfer of an interest of the debtor in property:

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

---

[7] Southstar also contends that the funds in the reserve escrow account which were used to complete the Attorney Fee Charge were Southstar's property and not property of FCA or FCA's bankruptcy estate. For the reasons discussed above, there is a genuine dispute regarding ownership of the funds held in the reserve escrow account. *See supra* Section B.

11

> (4) made—(A) on or within 90 days before the date of the filing of the petition; . . . and
>
> (5) that enables such creditor to receive more than such creditor would receive if— (A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). Thus, a claim to avoid a preference payment must demonstrate that: (i) a transfer was made to a creditor; (ii) the transfer was made on account an antecedent debt; (iii) the transfer was made while the debtor was insolvent; (iv) the transfer was made within 90 days before the debtor's petition date; and (v) the transfer enabled the creditor to receive more than it would have in a chapter 7 liquidation had the transfer not been completed and the creditor received payment to extent provided by the Bankruptcy Code. *See id.*

Section 547 of the Bankruptcy Code provides several affirmative defenses against a claim to avoid a preference payment. *See* 11 U.S.C. § 547(c). The "ordinary course" defense under § 547(c)(2) provides that

> [a debtor may not avoid a transfer] to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was—
>
> (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
>
> (B) made according to ordinary business terms;

11 U.S.C. § 547(c)(2). The party asserting the "ordinary course" defense bears the burden of proving the elements by a preponderance of the evidence. *See In re Whistler Energy II, LLC*, 608 B.R. 655, 658 (Bankr. E.D. La. 2019).

The "ordinary course" defense provides a subjective and an objective test. First, "[t]he subjective [test] of the ordinary course defense requires a fact-specific examination of the parties'

conduct to determine 'whether the transactions between the debtor and the creditor before and during the ninety-day period are consistent.'" *In re Cent. La. Grain Co-op., Inc.*, 497 B.R. 229, 236 (Bankr. W.D. La. 2013) (quoting *Lightfoot v. Amelia Maritime Servs., Inc. (In re Sea Bridge Marine, Inc.)*, 412 B.R. 868, 872 (Bankr. E.D. La. 2008). Courts generally consider the following factors under the subjective test: "1) the length of time the parties were engaged in the transactions at issue; 2) whether the amount or form of tender differed from past practices; 3) whether the debtor or creditor engaged in any unusual collection or payment activities; and 4) the circumstances under which payment was made." *In re Whistler Energy*, 608 B.R. at 659. Alternatively, the party asserting the "ordinary course" defense may satisfy the objective test which "requires the court to examine the industry in which the debtor and creditor operate to determine what usual or ordinary business practices are in that industry." *Id.* at 662.

Southstar argues that the subjective test of the "ordinary course" defense is satisfied in this case.[8] In support of its contention, Southstar relies on the Factoring Agreement which provides that (i) FCA is liable for all of Southstar's attorney's fees and costs incurred as a result of a dispute, [ECF Doc. 65-8, ¶ 16], and (ii) Southstar may maintain a reserve escrow account if it believes in good faith that there is a legal or indemnity risk that would require FCA "to fund legal expenses and costs," [ECF Doc. 65-8, ¶ 5]. Southstar provided no additional evidence regarding the parties' conduct and past practices.

In response, FCA highlights the lack of a prior practice between the parties. Southstar had only made the following two prior transfers from the reserve escrow account to Southstar's counsel: (i) a $467.50 transfer on March 21, 2023, and (ii) a $1,127.50 transfer on June 2, 2024. [ECF Doc. 65-13]. FCA also notes the unusual nature of Southstar's collection activities. Indeed,

---

[8] Southstar presented no evidence of the usual or ordinary business practices in the factoring industry.

Southstar unilaterally chose to collect the Attorney Fee Charge amidst ongoing litigation with FCA in the South Carolina District Court.

The Court finds that Southstar has failed to meet its burden of demonstrating that a genuine issue of material fact exists regarding whether the Attorney Fee Charge was made in the ordinary course of business.

> E. **A Genuine Issue of Material Facts Exists as to Whether any Transfers Between FCA and Southstar Are Avoidable Under §§ 547 or 548 of the Bankruptcy Code.**

In Count Five of the *Amended Complaint*, FCA seeks to recover the Attorney Fee Charge and the Overpayment as avoided transfers pursuant to 11 U.S.C. § 550. Because Southstar contends that neither transfer is avoidable under either §§ 547 or 548 of the Bankruptcy Code, *see supra* Sections C–D, Southstar contends that recovery of the funds under § 550 fails as a matter of law.

Section 550 of the Bankruptcy Code provides:

> Except as otherwise provided in this section, to the extent that a transfer is avoided under section . . . 547[ or] 548 . . . of this title, the [debtor-in-possession] may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550. A claim to recover avoided transfers must demonstrate that: (i) a transfer is avoidable under §§ 547 or 548 of the Bankruptcy Code and (ii) the party in possession of the property is either (a) the initial transferee or the entity for whose benefit the transfer was made or (b) an immediate or mediate transferee of the initial transferee. *See id.*

For the reasons discussed above, this Court finds that genuine issues of material fact exist regarding whether the Attorney Fee Charge or the Overpayments are avoidable under either §§ 547

or 548 of the Bankruptcy Code. *See supra* Sections C–D. Thus, summary judgment is not appropriate here on FCA's claim alleged under § 550 of the Bankruptcy Code.

## CONCLUSION

Because the Court finds that genuine issues of material fact exists, the resolution of the *Amended Complaint* and the Counterclaim is better suited for resolution at a trial on the merits. Accordingly,

**IT IS ORDERED** that the Motion is **DENIED**.

New Orleans, Louisiana, January 6, 2025.

_____
MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE